We are now in Hynix Semiconductor v. Rambus, Appeal 1299 from 2009. Mr. Srinivasan, welcome to the Court. Good afternoon to you. Thank you, Chief Justice Rizal. May it please the Court. Without disclosing it was doing so to its fellow members of the standard-setting organization, GEDEC, Rambus covertly expanded the scope of its patent applications to encompass industry standards chosen by that standard-setting body. It then expanded its claims in a manner that substantially overreaches the written description set forth in its original application. And then, as this Court heard earlier this afternoon, Rambus destroyed massive quantities of documents and computer files relevant to the coming wave of patent litigation, even though by that point Rambus had embarked upon a litigation strategy to the point of identifying potential defendants, claims, and venues. That course of conduct implicates three bases that I would like to focus on for overturning the judgment below, and with the Court's permission, although it may be quite ambitious in the limited time that I have, I'd like to address those three arguments in the following order. First, I'd like to address the question raised earlier concerning Rambus's spoliation of documents. Second, I'd like to address whether Rambus impliedly waived its ability to enforce its patent rights as a consequence of its conduct before the standard-setting board, GEDEC. And last, I'd like to address whether the scope of the claims asserted by Rambus in its amended claims overreached the written description set forth in its original application. If you don't get to it all, don't worry, because we have a very thorough briefing in the case. Good. Yes, Your Honor, it is thorough indeed. On the question of spoliation, I'd like to make two points in addition to the ones that were raised earlier today. The first is a simple one, and that is, I think that Rambus and we are on common ground in saying that there's no cause to reach a different conclusion in the two cases. The records are essentially identical, and for the same reasons that Rambus asserts at page 3 of his reply brief in the Micron case, we don't see a reason, a basis for drawing a distinction between the two cases. Now, the distinction that was drawn by the judges, in our view, is as follows. Judge White below, with all due respect to him, we think committed legal error in the way that he framed the appropriate test for determining when the duty to preserve arises. Did he not apply the reasonable foreseeability test? I don't think he did, Judge Lynn. I think he added an extra layer to that, and that's a layer of immediacy or imminence. And that's the point of disagreement, I think, between Judge Robinson and Judge Lynn. At page 148 of Judge Robinson's opinion, she makes clear that although imminence is certainly a sufficient basis to give rise to a duty to preserve, it's not necessary. Now, I think, with all due respect to Judge White, I think he had a different view of that, and that's set forth at page 90 of the joint appendix where he says that the proceedings were not immediately at hand. And I think that's the gravamen of why he got it wrong. But he seemed to draw the distinction between, he saw the turning point being the time when it looked like Intel was going to walk away from RDRAM, and that that was the point where, you know, is there life after Intel? And that was the turning point, and it was like, okay, now litigation has to be considered on the horizon, and any document destruction after that point would be spoliation. But prior to that time, there was just business planning, normal business operation. That's my understanding of how he viewed the record, applying what I believe is the same reasonable foreseeability test that you've been talking about today. I don't think he did with respect to Judge Lane, and I think the proof is in the pudding in terms of the time frame that he chose. The time when he said the duty to preserve kicked in was pegged to the time when Rambis conducted a search to a beauty context to determine which firm was going to represent it in the litigation. And that was one month before the complaint was filed. One month before the complaint was filed is the date that Judge White chose, and from our perspective, that's way too late in the game. In litigation that's as complicated as this is, and as much time and effort as it takes to prepare for litigation like this, to say that there's no duty to preserve documents until one month before the litigation in fact commences seems too far into the process from our perspective. And I think Judge Payne, in his now vacated, it's a vacated opinion, and I'm citing it not for its precedential force, but for its persuasive force, I think he hit the nail on the head in the way that he described it. And I know Your Honor asked earlier, how do we apply a capacious standard such as reasonable foreseeability in a particular context? And before trying to add a substrata beneath the standard reasonable foreseeability, I just make one preliminary observation, which is this, that there is a virtue to that standard as well, because it is a context-specific standard for a deeply contextual inquiry. And so it allows courts to take into account the particular facts and circumstances that inform, in a particular case, whether the duty to preserve has arisen. And the particular facts and circumstances that I think inform the court here are, as described by Judge Payne, and this is at page 556 of his opinion in the Samson case, quote, one does not make oneself battle-ready nor establish a discovery database, nor identify potential venues, nor identify specific litigation targets, nor select experts to address a vaguely anticipated litigation potentiality. And all of that had happened by the spring of 1998, and to suggest that litigation Experts had been selected? Experts had, the effort to select experts had been embarked upon. I don't think the experts, in fact, had been selected, Your Honor, but I think that was one of the near-term actions that needed to take place, and those efforts had commenced. But that litany of developments, I think, bespeaks something at least at the point of reasonable foreseeability, and I think considerably past that, as Judge Payne rightly understood. And the circumstances that faced the company at one month before the litigation had, in fact, commenced are way beyond that point. At that point, we had gone through all of the contingencies. What date are you suggesting? Well, we think spring of 1998, Your Honor, March 1998, but we don't have to win on that. As Judge Robinson rightly pointed out, even if you think that the date was December of 1998, that would still be enough, and I do agree with what Mr. Powers had said, which is that she didn't necessarily say that the duty had not arisen until that date. I read her to have said that the duty at least arose by that date, and that date is sufficient to give rise to an actionable claim here. And so we would say that the litigation was at least reasonably foreseeable by spring of 1998, but even if you advance forward to December, that would still suffice. And one other point I make about it. When was the litigation-related database started? It was started by the spring of 1998, and that's in the Joint Appendix at page 68, Your Honor. It's at paragraphs 42 and 43. Judge White makes the point that outside counsel had already been authorized to start creating the discovery database. This being Dan Johnson at Cooley? I believe so. It was Cooley, right, who was engaged at that point. And I think those efforts had already begun. He had been engaged to be their litigation counsel? Not to be their litigation counsel, Your Honor, but to advise them about litigation strategy. Well, I thought you were referring to what Judge Payne found in the Samson case, one of which was the selection of litigation counsel. I don't think he said selection of litigation counsel, Your Honor. It wasn't in the statement that I read. Dan Johnson was a litigator, and he was engaged in order to help develop a litigation strategy. I think at the point that they get to December of 1999 and they're about to embark upon actually filing suit, they do a beauty contest to determine which form is going to represent them in prosecuting the action. But Dan Johnson did consult with them on the litigation strategy, and that's why you see the March 1998 board presentation that's entitled Licensing and Litigation Strategy because that was something that was developed in consultation with the Cooley attorneys. So our view is that by March of 1998, but at the very least by December of 1998, litigation was at hand. And I'd like to make one point about the reasonable foreseeability standard, which gets to, I think, some of the questions Your Honor, Judge Landry raised earlier. At hand meaning likely but not necessarily imminent? Not necessarily imminent, no. And I think it would be a real mistake with respect, Chief Judge Michel, to impose an imminence requirement because there's too much in the control of the party who's going to initiate the litigation to interpose steps in between the time that we're talking about and the time the litigation might ultimately commence. And I think as long as litigation is reasonably foreseeable, the fact that it may not in fact commence until months, weeks, or even years into the future shouldn't take away from the fact that that party at that point should. So then what do we look at? Investment in pre-litigation activity or the percentage chance of litigation someday being filed or what? I think likelihood is a relevant consideration, Your Honor. It doesn't have to be probable, but likelihood is part of the calculus. But I would also look at the steps that the party has taken. And when you've taken steps like developing a strategy... As proof of likelihood or as some kind of independent factor that tells you litigation is going to happen? Well, litigation is going to happen is part of likelihood. And I think taking steps like identifying potential defendants, identifying potential venues, identifying the sorts of claims that would be brought are all indicia that litigation is sufficiently likely that at that point you ought to preserve documents. How does likelihood play in when we're talking about whether a plaintiff will initiate litigation or not? That's entirely within that party's control. It is, Your Honor, but I think what we look at is... It's likely if that party decides to do it. It's not likely if the party decides not to. Sure, and I think what you're looking at is objective indications of whether that party has embarked upon a path that... Objective indication of whether that party is going to decide to do something or not to do something? Yes, because I think objective in the sense that you would ask would a reasonable party who has taken those actions be one who's embarked upon, of course, the natural consequence of which would be litigation. And I think when you've taken actions like engage somebody to develop a litigation strategy, when you've identified potential claims, when you've identified potential defendants, and when you've identified potential venues, you are sufficiently far down the path that a duty to preserve documents attaches. Isn't it possible that you could have a situation where all those things have been identified where the prospects of litigation are nil? Suppose that the assessment is, well, we'll probably lose, so let's not file. But you've retained the litigation counsel to give you advice about that, done some other preparation, hired some experts, but you could still have the situation where the chance of filing is slim to none. You could, Your Honor, if there were indications to that effect, but there was nothing like that in this record. I mean, to the contrary, I think what's important to bear in mind is Brambus was in all likelihood going to litigate. Even with respect to the nuclear winter scenario memorandum that was issued in December of 1998, there was a sense from the earlier argument that that was laden with contingencies and it was meant to deal solely with the situation that was highly unlikely to develop, which is whether Intel, in fact, was going to drop RDRAM. But I think the better way to look at it is the way that Judge Ping looked at it in the Samsung opinion, which is that it involved two considerations. One is what we would do if Intel, in fact, decided not to go with RDRAM, in which case we'd have to come up with the litigation plan to deal with that. But they were going to litigate anyway because the plan all along was that we were going to give RDRAM a chance to take root, and we don't want to limit the possibility of that happening. But even if that doesn't happen, at that point we're going to assert our patent rights concerning SDRAM and DDR-SDRAM. So that was always going to happen. And I think when you have a situation in which you have the types of conditions that I've outlined earlier, and you don't have what Your Honor has opposed, which is indications that litigation, in fact, is not going to commence, by that point, at the very least, a duty to preserve documents does attach. Now, if I could move very quickly to the other two. So you have us simply adopt the laundry list of items that Judge Payne used to say, this is how you decide whether litigation is foreseeable or not. These are objective steps that you maybe could call pre-litigation. I think that would be the gravamen of the court's analysis, and I think it's consistent with the way courts typically conduct this inquiry under the reasonable foreseeability standard, which is broadly stated precisely to enable courts to take into account the particular types of circumstances that inform, in a particular case, whether litigation was sufficiently at hand that a duty to preserve documents should attach. So then the company that takes precautions at an early date, because they can afford to do so, even if the chances of litigating would be very, very slim, would incur an early duty to stop destroying documents? Well, I would be looking for evidence in the record, Your Honor, that the chances of litigation, in fact, are very, very slim, notwithstanding these kinds of steps, because I think companies don't take these sorts of steps lightly. This was something that was presented to the Board as part of a licensing and litigation strategy, and I think in the main, when that happens, litigation is a sufficient possibility to give rise to a duty to preserve. If there were indications in the record that this is the unlikely scenario in which, notwithstanding having undertaken those sorts of steps, litigation, in fact, was a remote possibility rather than something that was reasonably foreseeable, then I would certainly look at it. So are you suggesting that we adopt the pain list as a matter of Federal Circuit law, or as a prediction that if confronted with the issue, that's what the Ninth Circuit likely would do, or what? Well, I think the Ninth Circuit standards do govern, but as far as I know, it's virtually universally accepted that the overarching standard is reasonable foreseeability. And so I don't think the Court would be breaking any new ground by adopting that formulation. And then in terms of the substrata, what we point to on the facts of this particular case that indicate that the reasonably foreseeable trigger has come into being, I would look at those particular considerations, which, again, I don't think breaks any new ground, because that's the way courts typically conduct the inquiry. They cite the standard, and they look to the particular facts on the ground that inform whether the standard has been met in the circumstances, and that's what we would suggest the Court would do here. Now, on the other two issues, I see my time is just about to elapse before rebuttal time kicks in, but I would just say that our briefs cover the questions of whether Rambis impliedly waived its patent rights by virtue of its conduct before the JADAC Court, and that its amended claims overreach the written description that was set forth in its 898 application. Thank you. Thank you. Mr. Taranto. Thank you, and may it please the Court. I guess I will begin with the document destruction issue, and hope to say just a word or two about the last 20 seconds of my friend's argument. Document destruction. I want to make at least a legal point and a factual point. The legal point would be this. Judge White, at pages 89 and 90, did not adopt an imminence standard. He expressly quoted and relied on the ABEA's probable standard, and what he said in the critical paragraph, the paragraph that itemizes contingencies, was that the path to litigation was neither immediate nor clear. The nor clear part, that may have come first, then was spelled out in the contingencies. Now, the factual point would be this. When you look back at the spring 1998 period, that, as we heard earlier, even Judge Robinson did not find sufficient to trigger a preservation duty, what you will find is the kind of presentation that every business in this country makes in the usual, completely non-nuanced language of PowerPoint demonstrations. You will find the minutes of the March 1998 meeting in the appendix here, in which there is no approval of taking action on this strategy. What this was, was a planning for something that Rambis might have to do in the fairly long-term future. If one then looks at the kind of actions that my friend said one ought to look at to see if there really was a likelihood of litigation at that time, you will in fact not find, either in the record or more importantly, in Judge White's findings, a determination that Rambis hired experts, which would have required a budget for that, not in any budget, that Rambis actually did go and create a discovery database besides assigning an internal paralegal to put some contracts, not the kind of discovery database that you prepare for litigation. In fact, the record will not support more dispositively, or I should say dispositively, the findings do not contain any findings that say Rambis actually did these things, that Judge Payne, who took a much more expansive view of when a preservation duty should kick in, that these actually occurred. So even on this view of what is a set of objective indicia, you won't find in the findings, or in fact in the record, that Rambis did these things, all of which are quite costly. What they did was to do the kind of thing that lawyers, or in Mr. Karp's case, a non-lawyer, was tasked to do and will sit around and do, and say, well, what will happen if we want to go and do this kind of non-compatible licensing, other than for the RDRAMP? Well, let's think about who we would talk to, who our primary, who we would go to first, what happens if they say no, what are the forums to get quick resolution? You plan for a possibility. That's all that was in the spring of 1998, which is why, as I say, even Judge Robinson did not think that a preservation duty was triggered then, or lots of businesses in this country, in particular IP-owning businesses, will find themselves. Well, what about the summer of 99? Right. At that point, hadn't Fenwick been hired, apparently, as litigation counsel? No, I don't think litigation counsel had, no, litigation counsel was not hired until the fall of 99, after a couple of things happened. There was a September scare involving Intel, which was the crucial thing, right? Rambis' entire business strategy was, let's get Intel to make RDRAMP. I thought there was the July 8th memo from Fenwick litigators that set out a specific litigation plan. So when you say, well, there was no litigation counsel hired and this thing with Dan Johnson doesn't really count, well, maybe that's right, but what about the Fenwick stage? Dan Johnson, I think by then, is at Fenwick, and I guess I don't actually have the specific document or its wording in mind. They were still in some touch with Rambis, Dan Johnson was, but there was no decision to go and essentially have this beauty contest until the fall of 1999 when circumstances changed. Well, maybe not, but they hired lawyers to provide specific litigation proposals and they were provided in a memo dated July 8th from some group of lawyers at Fenwick and West. That may not be hiring the trial lawyer who's going to hire your case, but it's the step right before that to map out what your case is going to be. Right, I'm afraid I don't have the document specifically in mind. Judge White did not find that there was any hiring of litigation counsel before that late 1999 decision that followed. That may be the one big difference in the evidence. It may be that Robinson had that memo and White didn't. So I may be mixing up the records in the two similar but not identical cases. Let me add this. It is very important to understand that as between a reasonable foreseeability standard and what I think I now hear my friend suggesting more objectively, a likelihood, or in the ABA framework, a probability, the probability standard, even in the case of a patent holder thinking about its own initiation of litigation, there are lots of objective factors to use to determine that. Is there a budget? What do you know about whether they have patents? What do you know about whether the supposed targets have products? What do you know about whether the products are commercially successful enough to be worth suing about? SD-RAM was on its way out by the summer of 1999. DDR was completely uncertain. Brand new product and the race between RD-RAM and DDR was still a very hot race. It was entirely possible, and Rambis' hope, that DDR would not in fact be a successful product. And so what happened in September of... And then of course that's the final point. You look at the company's own internal records of their business strategy, and those records say, unmistakably, as Judge White found, what Rambis wanted was for RD-RAM to win the battle for the next generation. DDR versus RD-RAM. And the CEO, Tate, Jeff Tate, testified, if that happened, we might never even bother to go after the non-compatible ones because it's a dangerous weapon to deploy against your own customers. I asked you about a document I shouldn't have asked you about. Let me ask you about one that I should ask you about, and that's the CARP memo from June 24th, 2009. 1999. Even if the various states in 1998, perhaps all things considered, didn't create the preservation duty, why wasn't it created as of that late June 1999 memo that, as I recall at least, talked about we've got to be ready for litigation on 30 days' notice, where we've limited our targets to three, we're going to pick one of the three, we're going to probably sue October 1st. That starts sounding pretty serious to me. I think the most important thing I can say about that is, I guess, two related things. Think of who CARP was. CARP did not have within his purview the authority to make a fundamental business decision should we sue our biggest customers. And hence, the memo, it says quite expressly what I'm going to do in the fall is go first to the executive committee, Jeff Tate and others, and I'm going to talk to them about whether this makes sense. And then they're going to have to go to the board, and the board is going to have to decide whether that makes sense, because this is an earth-shaking decision for a tiny company like Rambus to start presenting IP claims against its biggest customers for what it still very much hoped and thought was going to be the RDRAM success. So Mr. CARP, what he was, again, planning for as his work as what he referred to as the Maytag repairman. He's this one guy thinking about non-RDRAM products in a company of 130 people who are working on the RDRAM project. On the other hand, are you really going to try to stand behind the argument that until the board authorizes a suit against Company X to be filed within 30 days that we don't have a corporate stance that gives rise to a preservation duty? No, we don't need that. And let me say why. Our case is exactly the same. Judge White has to be affirmed if one takes as the starting point for the preservation duty what he called the turning point in mid-September of 1999, which is when things became iffy enough with Intel, when a scare was put into Rambus that it decided, I guess it's a mid-September memo from Karp and then the board decides we are actually finally going to launch a negotiation. And that was what, a month after the last big shred day? Yes, that's right. So our case is perfectly sufficient if one says what's critical is the board deciding to launch negotiations because there's no difference in terms of document destruction between the negotiation date and the litigation date. If I could, I guess, talk just very quickly about the JEDEC issue unless there are further questions. Oh, actually, I'm sorry, I should say two other important words about the document destruction. When, as I think is undisputed, there is a finding of no bad faith and a finding of no prejudice, this judgment has to be affirmed even if Judge White got the preservation duty onset wrong. He found both of those, that there was no bad faith in any relevant sense because all of this planning took place very much under the auspices of legal advice, legal advice given with the express contemplation of the kind of litigation contemplation that was going on in the spring. Dan Johnson was in the very same meetings talking about possible forums and that kind of thing at the same time that he was saying here's our standard document retention policy template, that's exactly what Rambis adopted, completely neutral, no targeting of any class of documents. When all of that is taking place and given what I think has to be an acknowledged uncertainty about this preservation duty onset date in the law, Judge White was absolutely correct and in any event not clearly erroneous in finding no bad faith and second, equally correct in finding in any event no prejudice to the ability of Hynex to try its case. All that Hynex has is the universally available speculation that when some documents are gone maybe something in them could be relevant. That's not remotely enough because it's always true and when Hynex tried to itemize here's how we think we were prejudiced, it talked about patent issues and in this court only JEDEC related issues and Judge White marched through each of those and said there is nothing missing that could affect the soundness of the adjudication. So quite apart from the duty issue, Judge White has to be affirmed because of the combination of findings of lack of bad faith and no prejudice. Now I think my quick word about JEDEC. I guess I just want to say one particular thing on that. In Hynex's yellow brief at page 39 where it tries to respond to the IBM story, you may recall Gordon Kelly, one of the committee chairs came to JEDEC and said we are not going to tell you about our patents or our applications and Hynex in the yellow brief at 39 says no, all he said was anything we don't tell you about we won't ever charge you for and it then has a parenthetical but the parenthetical is not from Mr. Kelly, it's from their own Mr. Tabrizi. So the record is in fact from Mr. Kelly and Mr. Calter, an IBM guy, that Mr. Kelly repeatedly told the committee we will not disclose applications or even actually patents. And then one second again point on a yellow brief point on the question of the scope of the claims. Nothing in Philips disapproved any case that Infineon relied on in its claim construction ruling as to BUS and I include in that the Inverness case or I should say the Inverness cases. Infineon cited one, Philips disapproved another. They are in sequence in the F3 report, they are not the same case. So the Infineon claim construction remains valid and the written description determination, a factual determination but by the jury is supported by substantial evidence and cannot be overturned. Thank you. All right, thank you. We'll give you a minute for rebuttal. You can have the three minutes you thought to reserve. Thank you Chief Judge Rochelle. Just a couple of quick points. First on where my friend Mr. Toronto started with the question of whether eminence is a part of the inquiry from Judge White. I guess one point I'd make at the outset is that as I read Rambis' briefs, they embrace an eminence requirement and I think that's at page 65 of their brief in this case and at page 30 of their opening brief in the Micron case. I think they embrace an eminence requirement and I think the reason they embrace an eminence requirement is precisely because that's what Judge White did and we think with all due respect to Judge White erroneously interpose an eminence requirement. Now on the question of prejudice that was raised towards the end of the argument, I point the court to joint appendix pages 116 and 148. Where Judge White says he did not shift the burden on prejudice and he acknowledges that if the duty to preserve had been triggered, the burden should then shift on prejudice as it must to the party that spoliated the evidence to explain how its spoliation was non-prejudicial. But he says that he didn't shift the burden because he found that the duty to preserve hadn't been triggered. And so I think that was an error in prejudice that follows from his error on the question of whether the duty to preserve had kicked in. If you assume that the duty to preserve had kicked in, the burden then shifts to Rambis to explain how its destruction of 3,000 pages of documents was non-prejudicial and that's particularly difficult to do in the face of Judge White's finding that the documents were relevant and he found a nexus between the destroyed documents and the scope of the suit. And so I think in that context it's very difficult to understand how it would be that Rambis could satisfy its burden to show that it's non-prejudicial and I think it would be terribly unfair to put the burden on the non-spoiligating party to make the showing on prejudice. And on the question you'd asked Judge Rochelle about the documents from June and July of 1999, I'm told that one of them is found in our record at JA 61973 to 974. So those documents are in the Micron case and I think that Micron's brief at page 42 highlights what Your Honor highlighted which I think shows that certainly by the summer of 1999 before the second shred day the duty to preserve must have kicked in although we think it kicked in quite a bit earlier than that even. What was the appendix site in this case? It's JA 61973 to 74. 61973 to 74, okay. Yeah. And the last point I make is a very quick response to the JEDEC argument which is if you're looking for proof positive that there was a duty to disclose pending patent applications, I would look to this court's decision in Infineon which says that. This court's decision in Qualcomm which verifies that. The D.C. Circuit's decision in FTC versus Rambis which says that again. And Rambis' own emails and testimony which are in the joint appendix in this case which specifically recognized contemporaneously that there was an understood duty to disclose patent applications. Those patent applications were understood by Rambis to read on the standards that were ultimately chosen by JEDEC and therefore we think even if you were not to reach that conclusion on the basis of spoliation I think you would conclude that Rambis has impliedly waived its ability to enforce its patent rights. Thank you. Thank you. Mr. Tronto, I really never got to argue the cross appeal so reply and rebuttal on the cross appeal is sort of a moot point or an unreached point. So I think we'll conclude the argument at this point with our thanks to both counsel for a very well-argued case and we'll take the appeal under advisement. All rise. The Honorable Court is adjourned to tomorrow morning at 10 a.m.